FILED
2/26/21 10:56 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: : | Case No. 18-24151-GLT |
| : | Chapter 11 |
| **RESTLAND MEMORIAL PARKS, INC.**, : | |
| *Debtor*. : | |
| **RESTLAND MEMORIAL PARKS, INC.**, : | |
| *Movant*, : | Related to Dkt. Nos. 274, 286, 311 and 312 |
| v. : | |
| **FIRST COMMONWEALTH BANK**, : | |
| *Respondent*. : | |

| | |
|---|---|
| Donald R. Calaiaro, Esq. | Gary W. Darr, Esq. |
| Calaiaro Valencik | McGrath McCall, P.C. |
| Pittsburgh, PA | Pittsburgh, PA |
| *Attorney for the Movant* | *Attorney for the Respondent* |

## MEMORANDUM OPINION

In a last ditch effort to keep its chapter 11 prospects alive, Restland Memorial Parks, Inc. ("Restland") sold "the right to be interred" in 500 specified burial plots in its Monroeville, Pennsylvania cemetery. Restland hopes to use the sale proceeds to pay unsecured administrative expenses as part of a chapter 11 plan, but its efforts are opposed by First Commonwealth Bank ("Bank"), the holder of a perfected mortgage lien and security interest on Restland's real estate and other assets, who claims the sale proceeds are derivative of its collateral. The matter is of grave concern for Restland because without the sale proceeds, it cannot satisfy its ongoing obligations from operating revenues and a successful reorganization is unlikely. For the reasons stated below, the Court finds that the sale of internment rights

constitutes a privilege, irrevocable license, or easement which is subject to the Bank's lien. Accordingly, the net sale proceeds must be disbursed to the Bank absent its consent to an alternative arrangement.

## I. BACKGROUND

The facts are undisputed. Restland operates two cemeteries, one of which is located in Monroeville, Pennsylvania ("Cemetery").[1] In June 2005, Restland obtained a loan from the Bank in the original principal amount of $300,065.[2] To secure its obligations under the loan, Restland executed a mortgage dated June 24, 2005 ("Mortgage") granting the Bank a lien and security interest upon the real property where the Cemetery is situated, together with:

> all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto; . . . and all other rights, royalties, and profits relating to the real property . . .[3]

The *Mortgage* was recorded in the county real estate records soon after.[4]

Confronted by liquidity problems and unfunded obligations to a statutory perpetual care fund, Restland filed a voluntary chapter 11 petition on October 24, 2018.[5] The Bank thereafter filed a secured proof of claim alleging an outstanding balance of $153,783.33 due on the loan.[6]

---

[1] *Voluntary Petition for Non-Individuals Filing for Bankruptcy* (the "Petition"), Dkt. No. 1 and *Schedule A/B Assets* ("Schedule A/B"), Dkt. No. 8 at ¶ 55.1. Restland's second cemetery in Verona, Pennsylvania is not relevant to the current dispute.

[2] *Claim No. 16-1* at 5.

[3] Id. at 8.

[4] Id. (The real property described in the Mortgage constituted the premises conveyed to Restland by deed dated February 25, 1986 and recorded on February 26, 1986 in Allegheny County Deed Book Volume 7252, Page 212).

[5] *Petition*, Dkt. No. 1.

[6] *Claim No. 16-1* at 2.

Initially, Restland proposed a liquidating plan to pay off creditors through the sale of its assets,[7] but professional marketing efforts have been thus far unsuccessful. In the meantime, Restland's cash flow problems persisted, resulting in over $60,000 in unpaid postpetition federal tax obligations as of December 2019.[8] Under the threat of dismissal, conversion, or the appointment of a trustee,[9] Restland changed gears and proposed to pay creditors through ongoing operations while it continued to search for a suitable buyer.[10] After adopting measures to ensure the payment of ongoing tax obligations, Restland began exploring bulk sale options to generate additional funds to address the existing tax arrearage.

On July 22, 2020, Restland entered into a purchase agreement (the "Agreement") with the Muslim Community Center of Greater Pittsburgh ("MCC") to sell the "right to be interred in 500 specified burial plots" at the Cemetery for $100,000.[11] When Restland moved for Court approval of the *Agreement*,[12] the Bank objected to the extent the sale sought to divest its lien without payment even though it had not asserted such rights in the past.[13] Ultimately, the Court approved the *Sale Motion* subject to the proceeds being held in escrow pending a determination of the entitlement to the proceeds.

The parties submitted supplemental briefs and their arguments are fairly straightforward. Restland asserts that the rights in question are categorically excluded from the

---

[7] See *Chapter 11 Small Business Liquidating Plan*, Dkt. No. 78; *Amended Chapter 11 Small Business Liquidating Plan*, Dkt. No. 131.

[8] See *Status Report of Restland Memorial Parks, Inc. as Required by Order of Court dated December 6, 2019*, Dkt. No. 161.

[9] *Order to Show Cause Against Restland Memorial Parks, Inc.*, Dkt. No. 165.

[10] See *Second Amended Chapter 11 Small Business Liquidating Plan*, Dkt. No. 175; *Third Amended Chapter 11 Small Business Liquidating Plan*, Dkt. No. 181.

[11] *Exhibit A*, Dkt. No. 274-1 at ¶ 1.

[12] *Motion to Sell Right to be Interred in 500 Specified Burial Plots* ("Sale Motion"), Dkt. No. 274.

[13] *First Commonwealth Bank's Objections to Debtor's Motion to Sell Right to be Buried in 500 Specified Burial Plots* ("Sale Objection"), Dkt. No. 286 at ¶¶ 17-19.

*Mortgage* by a lack of reference to internment rights or licenses in the granting language.[14] The Bank, on the other hand, contends the right to be interred is in the nature of a privilege, easement, or license under the relevant case law, and points to the fact that the *Mortgage* explicitly covers privileges and easements.[15]  In response, Restland argues that licenses and easements are distinct as emphasized by the acknowledged use of the disjunctive "or" in the case law.[16]  Thus, because Restland insists that internment rights are in the nature of a license, they cannot be an easement subject to the *Mortgage*.[17]  Alternatively, Restland urges the Court to deny the Bank the sale proceeds on equitable grounds, asserting that to do otherwise would frustrate the Restland's reorganization by depriving it of working capital to the detriment of all creditors.[18]

## II.    JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States District Court for the Western District of Pennsylvania on October 16, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

## III.    DISCUSSION

To determine whether the Bank's lien attached to the sale proceeds, the Court must first ascertain the nature of what was conveyed.  Only then may it discern whether the internment rights fall within the *Mortgage*'s grant.  Because property rights in bankruptcy are

---

[14]  *Movant's Brief in Support of Motion to Sell Right to be Interred in 500 Specified Burial Plots* ("Debtor's Brief"), Dkt. No. 311 at 4-5.

[15]  *First Commonwealth Bank's Brief in Support of its Asserted Mortgage Lien on 500 Burial Plots Sold by Debtor and the Sale Proceeds Thereof*, Dkt. No. 312 at 4-10.

[16]  *Debtor's Brief*, Dkt. No. 311 at 5-7.

[17]  Id.  Restland's preference for construing internment rights as a license appears entirely based on their omission from the *Mortgage* and not any legal characteristics.

[18]  Id. at 7-8.

4

defined by applicable state law,[19] the Court looks to Pennsylvania cemetery law to quantify the bundle of rights associated with the "right to be interred."

In Pennsylvania, the post-colonial law surrounding cemeteries and burial rights developed in part from religious traditions where Christian churches generated revenue by renting or selling inheritable pews to parishioners[20] without conveying any "right to the ground on which [the pew] stands."[21] In the *Appeal of Kincaid*,[22] the Pennsylvania Supreme Court observed that "[t]he grant of a pew in a church edifice creates a kind of right which appears to be in all respects analogous to that of a burial lot in a grave-yard."[23] The Court surmised that the sale of a burial plot, like a church pew, would not convey any right to the soil itself and is,

> [a] grant of a mere *license* or *privilege* to make internments in the lots described, exclusively of others, as long as the ground should remain 'the burying-ground of the church.' . . . The lot-holder purchased a *license* -- nothing more --- *irrevocable* as long as the place continued a burying ground -- but giving no title to the soil.[24]

---

[19] Butner v. United States, 440 U.S. 48, 54 (1979).

[20] See generally Zernosky v. Kluchinsky, 278 Pa. 99, 102, 122 A. 262, 262 (1923) ("Religious societies, in right of church control, may make reasonable by-laws and regulations relative to pews."); 2 Blackstone's Comm. 428, 429 ("Pews … may descend by custom immemorial … from the ancestor to the heir."); Wm. C. Schley, *Property in Church-Pews Market-Stalls and Lots in Cemeteries* (pts. 1-2), 28 U. Pa. L. Rev. 1, 65 (1880). Available at: https://scholarship.law.upenn.edu/penn_law_review/vol28/iss1/2/; Editors, *The Cemetery Lot: Rights and Restrictions*, 109 U. Pa. L. Rev. 378, 378-79 ("This unique treatment [of burial places] results from the traditional absence of commercialism in matters involving such property and from the extensive ecclesiastical control over burial matters and concomitant clerical discouragement of secular intervention.").

[21] Church v. Wells, 24 Pa. 249, 251 (1855) ("A pew right is . . . is entirely peculiar, and yet it is a sort of interest in real estate").

[22] Appeal of Kincaid, 66 Pa. 411 (1870). Since *Appeal of Kincaid* was issued, Pennsylvania state courts have referred to the decision as *Kincaid's Appeal* and this Court will do the same.

[23] Id. at 422. See Brnilovich v. St. George Independent Serbian Orthodox Church, 326 Pa. 218, 222, 191 A. 655, 656 (1937) ("[this court] long ago likened the privilege of sepulture in a cemetery to that of a pew right, which confers upon the grantee only a license to use the property . . .").

[24] Appeal of Kincaid, 66 Pa. at 420-21 (emphasis added).

5

One-hundred and fifty years later, the holding in *Kincaid's Appeal* has been repeatedly reaffirmed and is recognized as the foundation for the modern understanding of burial rights.[25]

Today, the Pennsylvania courts commonly describe internment rights as being in the nature of "a privilege, easement, or license."[26] This is not a departure from *Kincaid's Appeal*, but a refinement of the Pennsylvania Supreme Court's acknowledgment that these titles are not mutually exclusive.[27] Indeed, a "privilege" is merely a descriptor used to provide contours to an interest and is similar to phrases such as "liberty," "advantage," or "permission."[28] In general, all "licenses" and "easements" are "privileges,"[29] despite also being doctrinal categories of real property known as servitudes.[30] There is also a "functional overlap"[31] between

---

[25] See In re Leonard's Estate, 343 Pa. 198, 201, 22 A.2d 676, 679 (1941); Walter v. Baldwin, 126 Pa. Super. 589, 595, 193 A. 146, 149 (1937); Brnilovich v. St. George Indep. Serbian Orthodox Church of Pittsburgh, 191 A. at 656–57; Hancock v. McAvoy, 151 Pa. 460, 464, 25 A. 47, 48 (1892); Craig v. First Presbyterian Church of Pittsburgh, 88 Pa. 42, 51 (1878); Petition of First Trinity Evangelical Lutheran Church in City of Pittsburgh, 214 Pa. Super. 185, 192, 251 A.2d 685, 689 (1969); Cedar Hill Cemetery Co. v. Lees, 22 Pa. Super. 405, 410 (1903); Petition of First Evangelical Lutheran Church of Greensburg, Pa., 13 Pa. D. & C.2d 93, 101 (Quar. Sess. 1958); see also Editors, *The Cemetery Lot: Rights and Restrictions*, 109 U. Pa. L. Rev. 378, 378-79; but see Pitcairn v. Homewood Cemetery Co., 229 Pa. 18, 77 A. 1105 (1910) (finding the purchaser of burial lot acquired "the lot itself, [and] not a mere interest therein," but that the fee was nonetheless subject to restrictions in a manner consistent with *Kincaid's Appeal*).

[26] See, e.g., Petition of First Trinity Lutheran Church, 214 Pa. Super. at 192; 6 Summ. Pa. Jur. 2d Property § 2:7 (2d ed.).

[27] Appeal of Kincaid, 66 Pa. at 420-21 (referring to internment rights as an irrevocable license or privilege).

[28] See Coffin v. Old Orchard Dev. Corp., 408 Pa. 487, 494, 186 A.2d 906, 910 (1962); Morning Call, Inc. v. Bell Atl.-Pennsylvania, Inc., 2000 PA Super 294, ¶ 8, 761 A.2d 139, 142 (2000); Harkins v. Zamichieli, 266 Pa. Super. 401, 406, 405 A.2d 495, 498 (1979).

[29] See Coffin v. Old Orchard Dev. Corp., 408 Pa. at 494 (an "easement is a liberty, privilege, or advantage"); Lehigh & N. E. R. Co. v. Bangor & P. Ry. Co., 228 Pa. 350, 353, 77 A. 552, 553 (1910) ("A license is in the nature of a personal privilege").

[30] See Morning Call, Inc. v. Bell Atlantic-Pennsylvania, Inc., 761 A.2d at 142. Just to clarify, an easement creates a nonpossessory interest that runs with the land of another, Coffin v. Old Orchard Dev. Corp., 408 Pa. at 494, while a license is a permission to allow activity on the land of another that would otherwise be a trespass. Lehigh & N.E.R. Co. v. Bangor & P. Ry. Co., 228 Pa. at 353.

[31] Dukeminier & Krier, Property, 811 (8th ed. 2014).

6

licenses and easements, as an irrevocable license operates like an easement and provides the holder with the same rights and privileges.[32]

Without belaboring the point, the granting language of the *Mortgage* includes "all easements . . . [and] privileges"[33]—two of the three terms used to define internment rights under Pennsylvania law. The omission of "licenses" from the *Mortgage* is irrelevant because the courts' use of the disjunctive "or" in describing internment rights is clearly *inclusive*, not exclusive. An exclusive disjunctive[34] (meaning that internment rights are *either* a privilege, easement, *or* license, but not any combination of them) is at odds with the characterization of internment rights as a "license," "privilege," and an "irrevocable . . . license" (easement) in *Kincaid's Appeal*,[35] to say nothing of the conceptual basis of these terms. Therefore, the rights conveyed to MCC were expressly subject to the Bank's lien, which would then naturally attach to any proceeds arising from the sale of those rights.

In closing, the Court appreciates Restland's frustration. The inability to use the proceeds arising from the sale of internment rights effectively chokes off its capacity to generate the funds necessary to confirm a chapter 11 plan. But the Court's equitable

---

[32] Morning Call, Inc. v. Bell Atlantic-Pennsylvania, Inc., 761 A.2d at 143-44; Restatement (Third) of Property (Servitudes) § 1.2 at cmt. g. (2000) ("*Irrevocable licenses and executed parol licenses are easements*. The difference between a license to enter and use land and an easement to make the same use is that the license is revocable at will by the owner of the burdened land. If the license becomes irrevocable, or revocable only on the occurrence of a condition, it is indistinguishable from an easement. … An irrevocable license is a license that becomes an easement by estoppel under the circumstances set forth in § 2.10, Servitudes Created by Estoppel.").

[33] *Claim No. 16-1* at 8.

[34] See Cipher Pharm. Inc. v. Actavis Labs. FL, Inc., 99 F. Supp. 3d 508, 518 (D.N.J. 2015) (Stated in formal logic terms, "or" can be used to form two types of compound sentences: inclusive disjunctions and exclusive disjunctions. An *inclusive* disjunction is "a complex sentence in logic that is true when *either or both* of its constituent propositions are true." *Merriam–Webster Dictionary* (emphasis added). An *exclusive* disjunction is "a compound proposition in logic that is true when *one and only one* of its constituent statements is true." Id. (emphasis added)).

[35] Appeal of Kincaid, 66 Pa. at 420-21.

powers do not permit a secured creditors' collateral to be stripped away for no other reason than to benefit lower priority creditors.

## IV.    CONCLUSION

In light of the above, the Bank is entitled to the sale proceeds currently held in escrow, less any approved sale expenses, as they derive from the sale of its collateral. As a result, the Bank's limited objection to the sale is sustained. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. The Court will issue a separate order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

_____
GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

Dated: February 26, 2021

Case administrator to mail to:
Debtor
Gary Darr, Esq.
Donald Calaiaro, Esq.